Brendan V. Monahan
Velikanje, Moore & Shore, P.S.
WSBA No. 22315
405 East Lincoln Ave.
Yakima, WA 98907
Telephone: (509) 248-6030
Facsimile: (509) 453-6880
bmonahan@vmslaw.com

Donald R. Warren (*Pro Hac Vice*)
Warren ▪ Benson Law Group
7825 Fay Ave., Suite 200
La Jolla, CA 92037
Telephone: (858) 456-1900
Facsimile: (858) 454-5878
donwarren@warrenbensonlaw.com

Attorneys for *Qui Tam* Plaintiffs

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JUN 28 2006

JAMES R. LARSEN, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

RECEIVED
JUN 28 2006
CLERK, US DISTRICT COURT
SPOKANE, WASHINGTON

ORIGINAL

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

## SPOKANE DIVISION

| | |
|---|---|
| UNITED STATES, and the STATES of FLORIDA, TENNESSEE, TEXAS and VIRGINIA, *ex rel.*, Joel Heinzen, M.D. and Christopher Rhead, M.D., <br><br> Plaintiffs <br><br> v. <br><br> HEALTH MANAGEMENT ASSOCIATES, INC., and EMCARE, INC. <br><br> Defendants | CASE NO. **CV-06-3051-RHW** <br><br> COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACTS  31 U.S.C. §3730, et seq; Fla. Stat. 68.081 *et seq*; Tenn. Code Ann. § 71-5-181 *et seq*;  Tex. Hum. Res. Code § 36.001 *et seq*; and Va. Code Ann. § 8.01-216.3 *et seq* <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED UNDER SEAL pursuant to 31 U.S.C. §§ 3730(b)(2) and (3)** <br><br> **FILED AS PAPER COPY pursuant to Local Administrative Procedures I. A. 3. and III. A.** |

COME NOW *QUI TAM* RELATOR-PLAINTIFFS Joel Heinzen, M.D. and Christopher Rhead, M.D., suing for the United States of America, pursuant to 31 U.S.C. § 3730 *et seq*, the State of Florida pursuant to Fla. Stat. 68.081 *et seq*, the State of

1

Complaint for Violations of False Claims Acts

Tennessee pursuant to Tenn. Code Ann. § 71-5-181 *et seq*, the State of Texas pursuant to Tex. Hum. Res. Code § 36.001 *et seq*, and the State of Virginia pursuant to Va. Code Ann. § 8.01-216.3 *et seq* and allege as follows:

1. This action is based upon the defendants knowingly submitting false claims, and knowingly causing false claims to be submitted to Medicare, Medicaid and other federally funded programs, and knowingly using false records or statements to get false or fraudulent claims paid or approved. The Defendants accomplished this scheme through a computer software system that automatically falsely documents various emergency room diagnoses and procedures and results in the automatic ordering of medically unnecessary tests.

## I. JURISDICTION

2. Jurisdiction over the federal claims asserted herein is based upon federal subject matter pursuant to 31 U.S.C. § 3729 *et seq*.

3. Jurisdiction over the state claims asserted herein is based upon 31 U.S.C. § 3732(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a).

## II. VENUE

5. Venue is proper in the Eastern District of Washington, under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because the defendants transact business in this District and because the defendants committed acts within this district that violated 31 U.S.C. § 3729.

## III. PARTIES

6. *Qui tam* plaintiff Joel Heinzen, M.D., is a licensed physician who has had a lengthy career as an emergency room physician at Providence Yakima Medical Center

2

Complaint for Violations of False Claims Acts

("Providence Hospital"), which was purchased by defendant Health Management Associates, Inc., and renamed Yakima Regional Medical and Heart Center. Dr. Heinzen is a United States citizen and a resident of the State of Washington, residing in Yakima, Washington.

7.   *Qui tam* plaintiff Christopher Rhead, M.D., is a licensed physician who worked as an emergency room physician at Providence Yakima Medical Center ("Providence Hospital"), which was purchased by defendant Health Management Associates, Inc., and renamed Yakima Regional Medical and Heart Center. Dr. Rhead is a United States citizen and a resident of the State of California, residing in Chico, California.

8.   The United States of America, through its agencies, including, Centers for Medicare and Medicaid Services, and its Veterans Administration, among others, has provided funds for false claims at issue herein.

9.   Each of the States of Florida, Tennessee, Texas and Virginia, through its respective participation in the Medicaid program, has provided funds for false claims at issue herein.

10.   Health Management Associates, Inc. ("HMA"), is a publicly traded corporation with headquarters located in Naples, Florida. Directly and through its subsidiaries, HMA owns and operates at least sixty two acute care hospitals throughout the states of Alabama, Arkansas, Florida, Georgia, Kentucky, Missouri, Mississippi, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington and West Virginia.

11.   EmCare, Inc. ("EmCare") is a for-profit corporation headquartered in Dallas, Texas. EmCare contracts to provide physician and other staffing for the

3

Complaint for Violations of False Claims Acts

1  Emergency Departments at HMA hospitals in many states, including HMA hospitals in Florida and Texas.

12. <u>Conspiracy between HMA and EmCare.</u> The *Qui Tam* Plaintiffs are informed and believe and on that basis allege, that the Defendants HMA and EmCare, at all times during which EmCare provider Emergency Department staffing at HMA hospitals, were co-conspirators in the violations of the Federal and State False Claims Acts alleged herein.

### IV. MEDICARE AND MEDICAID BACKGROUND

13. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain health care services. The Medicare Program is a federally funded program designed to primarily provide health care benefits to the aged. Part A of the Medicare Program authorizes payment for institutional care, including inpatient hospital care and related services. *See 42 U.S.C. §§ 1395c-1395i-5*. Part B of the Medicare Program authorizes payment for physician services and other non-institutional medical services. *See 42 U.S.C. §§ 1395j–1395w-20*. A substantial portion of HMA's and EmCare's revenues are derived from payments received under the Medicare and Medicaid Programs and other federally funded programs.

14. HHS is generally responsible for the administration and supervision of the Medicare Program. CMS, a component of HHS, is directly responsible for the administration of the Medicare Program. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries," typically insurance companies, who are responsible for processing and paying claims and auditing cost reports. *42 U.S.C. § 1395h*. Similarly, CMS contracts with "carriers" to assist in the administration of Medicare Part B. *42 U.S.C. § 1395u*.

4

Complaint for Violations of False Claims Acts

15. Not surprisingly, in order to prevent waste, fraud and abuse, the Social Security Act, *42 U.S.C. § 1395y(a)(1)* states the Medicare Program is only authorized to pay for items and services that are medically "reasonable and necessary." The Secretary of HHS is authorized to define what services meet that criteria. *42 U.S.C. § 1395ff(a)*. Medicaid and other federally funded programs also only pay for items and services that are medically "reasonable and necessary."

16. Medicare providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those stated in the Medicare Manuals. *Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 64-65 (1984)*. A provider's failure to inform itself of the legal requirements for participation in the program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims or certifications in question, under the False Claims Act. *United States v. Mackby, 261 F.3d 821, 828 (9th Cir. 2001)*. These requirements also apply to Medicaid providers.

17. Since March 2, 1988, Medicare regulations have expressly stated that one of the "basic conditions" for a provider to receive payment from Medicare is that the provider "must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment." *42 C.F.R. § 424.5(a)(6)*. Prior to that time, Medicare regulations included the requirement: "The provider shall furnish such information to the intermediary as may be necessary to assure proper payment by the program." *42 C.F.R. § 405.406(d)*.

18. Under the Medicare Program, CMS enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program. Upon discharge of a Medicare beneficiary from a participating hospital, the

5

Complaint for Violations of False Claims Acts

1  hospital submits claims for interim reimbursement for items and services provided to the

2  beneficiary. Hospitals submit patient-specific claims for interim payments on a standard

3  form. Before 1994, this was called a HCFA Form UB-82. After 1994, a modified

4  version called a HCFA Form UB-92 was used.

    19.    In addition to claims for services to individual patients, Medicare providers
are required to submit annually a Form HCFA-2552, more commonly known as the Hospital Cost Report, stating the amount of interim payments they have received and the amounts they believe they were entitled to receive from Medicare during the year. Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. If the Hospital Cost Report shows that the interim payments that Medicare made to a provider exceed the amount the provider was entitled to receive, the provider must reimburse Medicare for the difference.

    20.    At all times relevant to this Complaint, every Hospital Cost Report contained a "Certification" that had to be signed by the chief administrator of the provider or a responsible designee of the administrator. That Certification stated in part:

> to the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

    21.    Thus, HMA was required to have its hospitals certify that the filed Hospital Cost Report was (1) _truthful_, i.e., that the cost information contained in the report was true and accurate, (2) _correct_, i.e., that the provider was entitled to reimbursement for the reported costs in accordance with applicable instructions, and (3) _complete_, i.e., that the

6

Hospital Cost Report was based upon **all** information known to the provider.

22. The Hospital Cost Report form (Form HCFA-2552-81) reminded providers that "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law."

23. Medicare providers are required to disclose all known errors and omissions in their claims for Medicare reimbursement (including their cost reports) to their fiscal intermediaries. 42 U.S.C. § 1320a-7b(a) states in part:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall . . . be guilty of a felony. . . .

24. The Medicaid program is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. Under the Medicaid program, the Federal government provides matching funds and ensures that the states comply with minimum standards in the administration of the program.

25. As a result of its involvement in the Medicaid program, the federal government provides at least half of the funds used to purchase Medicaid reimbursable hospital and physician services and related patient testing.

## V. HMA AND YAKIMA REGIONAL MEDICAL AND HEART CENTER

26. Relators Dr. Heinzen and Dr. Rhead were member physicians in Yakima Emergency Physicians ("YEP"), a professional corporation comprised solely of physicians who are Board Certified in Emergency Medicine. From approximately 1975 through August of 2003, YEP staffed the Emergency Department ("ED") at Providence Yakima Medical Center ("Providence Hospital"). Providence Hospital was a non-profit

7

Complaint for Violations of False Claims Acts

facility owned and operated by the Sisters of Providence. Providence Hospital was purchased by HMA via its subsidiary, Yakima HMA, Inc., d/b/a Yakima Regional Medical and Heart Center, in August of 2003.

27. <u>ProMed Charting System</u>. Prior to HMA's purchase of the hospital, YEP's physicians prepared handwritten and/or dictated chart notes to reflect their treatment and care of patients. These chart notes were then provided to the hospital for use in preparing medical billings.

28. When HMA took over, it immediately insisted YEP begin using something called the "ProMed" charting system. "ProMed" is a software program designed and marketed by ProMed Clinical Systems, LLC. HMA said the software was designed to promote patient welfare and reduce malpractice claims. Initially YEP was asked to use paper charts generated by the ProMed program, but in September of 2004 they were required to begin using the computerized version of the software, referred to as "ProMed Blue," named for the blue background on all of the program screens.

29. The "ProMed Blue" charting system is an interactive computer program that allows emergency physicians (and staff) to create electronic medical charts. The program uses a touch-screen interface that, according to its promotional literature, "*automates many important functions to assist the healthcare team in administering appropriate, cost effective, and consistent high quality patient care.*" The bottom line sales pitch for ProMed is that it provides "<u>measurable</u> *performance improvement in your medical department.*" (<u>Emphasis</u> in original).

30. YEP's physicians immediately disliked ProMed for a number of reasons. They found it cumbersome and counter-intuitive, but most important they found it to be dangerously inaccurate. The program was loaded with defaults and automated charting

Complaint for Violations of False Claims Acts

language that resulted in misleading medical charts. There were many instances in which YEP physicians would follow the approach recommended by the training and instructional materials, only to generate a medical chart that falsely articulated examinations which had not occurred and physical observations which had not been noted by the physician.

31. Another troubling element of ProMed was that it automatically ordered a series of expensive and unnecessary tests whenever a nurse designated each patient's "Chief Complaint" at triage. For example, if the nurse entered the Chief Complaint of "Abdomen Pain" for a patient of 55 years or older, the ProMed system would automatically recommend a Complete Blood Count, Comprehensive Metabolic Panel, Lipase, Urinalysis and EKG. While some of these "default" tests could be justified in certain circumstances, the vast majority of them were medically unnecessary. The Emergency Department nurses were all instructed by HMA to comply with these recommendations, and were individually reprimanded by their superiors if they failed to do so.

32. YEP's concerns with "ProMed Blue" were immediately brought to the attention of HMA. HMA's response was that the physicians needed to keep working on it. As discussed in more detail below, HMA directly informed the physicians that utilization of ProMed software and compliance with its programmed diagnoses, procedures and testing would be a condition of any continuing contractual relationship.

33. YEP then undertook a concerted effort to adapt to ProMed and/or address its shortcomings. YEP's efforts came in four primary contexts:

i) The YEP physicians began documenting ProMed errors and glitches and provided the documentation to HMA. This was initially done in an effort to work with

9

HMA and the ProMed software designers in fixing the system so it would actually document what the physician was trying to document.

  *ii)* YEP physician, Regan Wylie, M.D., manually reversed or eliminated much the medically unnecessary "default" test ordering mechanism.

  *iii)* YEP physician, Marty Brueggemann, M.D., the newest YEP member and the consensus choice as the most computer savvy of the group, engaged in phone conversations and an extended email exchange with a ProMed programmer, Paul Lindeman. Dr. Brueggemann outlined the primary shortcomings of the software, and implored Lindeman to address the most dangerous and inefficient elements. His suggestions and concerns were summarily rejected by Mr. Lindeman, and he was told, "it is what it is."

  *iv)* YEP physicians, Christopher Rhead, M.D., and Michael Hauke, M.D., traveled to the Georgia Medical Center in Statesboro, Georgia, to observe other HMA physicians utilize ProMed in an Emergency Department setting. The visit to Statesboro was arranged and funded by HMA in an effort to showcase the successful implementation of ProMed. The results may have surprised HMA. The Emergency Department physicians in Statesboro uniformly despised the program and the automated charting language was candidly described as follows:

> *Questionable coding and billing accuracy derived from inaccurate, sometimes frankly fraudulent automated system documentation.*

  34. <u>Physician Activity Profiles</u>. Despite the physicians' concerns, HMA still wanted YEP to use "ProMed Blue". At a certain point in time the physicians simply stopped using it when it became clear that neither HMA nor ProMed had any interest in working with them to change the program into a more accurate and intuitive system. The

10

Complaint for Violations of False Claims Acts

nurses, however, were still required to use the program. Countless examples of grossly inaccurate documentation can be found throughout the nurses' charting after the inception of "ProMed Blue." For example, a comatose patient would be identified as being "able to perform all of their own activities of daily living." However, because triage assessment forms were still being generated by the computer, the resulting automated tests were still ordered. Further, the financial tool "Physician Activity" was still tracked.

35. "Physician Activity" is a ProMed euphemism for adherence to programmed medical instructions and HMA "productivity" goals. For example, when a patient presents with a given series of complaints or symptoms, the ProMed software will often recommend that the patient be admitted. The physician can ignore or override the recommendation, but the override becomes a mark on the physician's permanent record. The ProMed software keeps meticulous track of each ED physician's "Activity", and then generates a monthly report of the physician's compliance with the computerized procedures and testing recommendations. Any time a physician overrides or ignores a ProMed recommendation HMA is aware of it and keeps track of it.

36. HMA produced "Physician Activity Profile" reports each month and discussed them in detail with YEP. The "Physician Activity Profile" reports tracked the following information for each physician:

- Percentage of ProMed recommended patients admitted to the hospital
- Percentage of ProMed recommended tests that were actually ordered
- Percentage of cases where the patient's primary care physician was consulted
- "Quality Review" Compliance

37. "Quality Review" was a term chosen by HMA/ProMed to describe the percentage of times a physician chose to override a ProMed admission recommendation.

11

Complaint for Violations of False Claims Acts

In essence, HMA and ProMed were keeping track of how often YEP's physicians overrode ProMed's automated admission recommendations.

38.  Each month, HMA representatives Tim Trottier and Sean Richardson would discuss the "Physician Activity Profile" reports with YEP and tell the physicians to "improve their scores". YEP was told Emergency Department physicians in other HMA hospitals had exceedingly higher scores on the ProMed "Physician Activity Profile", and that YEP needed to step up its "performance" in order to stay competitive. Trottier and Richardson made it clear that their own performance would be judged by their superiors based on how the physicians' activity was reflected on the "Physician Activity Profile" reports.

39.  <u>HMA "Benchmarks"</u>. The "Physician Activity Profiles" were in and of themselves disconcerting to YEP's physicians. They did not believe it was appropriate to have a computer program dictating diagnosis and treatment of emergency medical care, and they resented HMA for requiring that they should defer their medical judgment to the pre-ordained defaults and recommendations of a software program.

40.  HMA then became far less subtle in its approach. Rather than simply use the "Physician Activity Profile" as a data management tool, HMA established ProMed "Benchmarks" that YEP was required to achieve. HMA's "Benchmark" requirements for YEP were as follows:

- Overrides of ProMed admission recommendations:                    Less than 35% of cases.

- Primary care physicians called:                    At least 35% of all cases.

- Ordering ProMed recommended tests:                    At least 65% of all tests.

12

Complaint for Violations of False Claims Acts

41.     Based on the reality of the medically necessary procedures and testing for each patient, YEP's physicians did not come close to meeting HMA's benchmarks. This was a matter of great conflict between the physicians and the hospital administration. YEP's physicians refused to create needless phone "consults" with primary care physicians simply so they could "improve their scores". They would not order tests that they did not believe were medically necessary. They would not make medically unnecessary admissions of patients for the sake of pleasing the hospital's profit-driven administrators.

42.     HMA was not pleased. YEP's failure to meet HMA's "Benchmarks" was the theme at nearly every monthly meeting. These topics carried through the parties' contractual negotiations in late 2004 and early 2005.

43.     <u>Quid Pro Quo</u>. On January 5, 2005, HMA sent YEP's contract negotiation team, Dr. Rhead, Dr. Olson, and Dr. Plunkett, an email directly tying YEP's compliance with the ProMed generated diagnoses and test ordering, to YEP's financial compensation. Attached to the email was a spreadsheet titled "YEP Monthly Subsidy Detail", and it included a brief explanation of the monthly financial support YEP had been receiving (and might continue to receive) from HMA. The email further stated:

> *The above amount is fully at risk contingent upon the group, YEP, meeting the following ProMed criteria:*
>
> - *% of attendings called:*    *Greater than 35%*
> - *Pts w/tests ordered:*         *Greater than 65%*
> - *Quality Review:*                *Less than 35%*

44.     The YEP physicians were predictably outraged and astonished that HMA would actually offer them financial incentives to disregard their medical judgment in

13

Complaint for Violations of False Claims Acts

order to meet what they believed to be arbitrary, medically unjustified and profit-driven "Benchmarks".

45. Two days after the HMA email, Dr. Rhead resigned from YEP. In his resignation letter, he wrote:

> *Physician practice and patient care cannot be regulated by a computer algorithm. The most recent proposal by the administration is to offer some level of support based on HMA "benchmark" criteria. They are essentially holding a financial hammer over our heads, forcing us to comply with meaningless data which will make them look better to the higher administration in Florida....one of the criteria that they are essentially going to pay us for will be "percentage of patients with tests ordered" – if this isn't breaking the law, I don't know what is.*

46. Dr. Heinzen had resigned one day before Dr. Rhead. He subsequently recounted his reasons for leaving:

> *When HMA arrived, they began collecting ED patient data and Mr. Trottier would come to almost every YEP meeting to discuss their figures. They would review our level of admissions based on chief complaint and we were expected to meet HMA's standards for frequency of admission and it was made very clear that we were to be judged by our compliance with such. There was no medical reason evident for such criteria and only two YEP members ever came close to occasionally meeting the admit levels. I had been QA director for YEP for years and we had no problems with the quality of care on an ongoing basis that would require meeting admission frequency standards. I do not believe other members of the medical staff were aware that HMA was demanding that we meet admission frequency criteria or that we were being reviewed on the frequency of calling the patient's primary physician (apparently seen as a portal for obtaining admission).*

47. YEP rejected HMA's effort to link compensation with meeting ProMed criteria or HMA "Benchmarks". At that point, HMA declared the negotiations at an impasse.

## VI. <u>EMCARE, INC.</u>

48. The following month, in February of 2005, when YEP still had 10 months left on its existing contract, YEP's physicians began receiving calls from an entity named EmCare, Inc., which is a nationwide Emergency Department staffing corporation. EmCare representatives told YEP physicians that HMA had awarded EmCare the contract to staff the Yakima Emergency Department. EmCare stated it was to take over staffing and management of the Emergency Department on April 1, 2005 (although it did not

14

Complaint for Violations of False Claims Acts

actually take over the department until June 3, 2005). EmCare representatives told YEP physicians that HMA was replacing them, in part, because YEP would not utilize the ProMed software system.

49. EmCare came to Yakima in early March of 2005 to recruit YEP's physicians. However, none of the YEP physicians were willing to join EmCare due to ethical concerns.

50. Based on information and belief, it is alleged that EmCare is ordering significantly more tests through the use of the ProMed computerized mandate of incorrect diagnoses, and unnecessary testing, and is also doing so at the other HMA hospitals for which it is staffing the Emergency Department.

51. For example, HMA's Pathology Laboratory Department met on April 21, 2005, and one of the topics at the meeting was the fact that EmCare would be starting June 1, 2005. The following notation appears in the Director's Notes:

> *New ED group (EmCare) to start June 1. All of YEP physicians have been invited to stay, but have decided not to. Expect higher utilization of ProMed and tests ordered at triage after the change.*

### VII. COUNT ONE

**(For Violation of 31 U.S.C. § 3729 et seq.)**

**(Against all Defendants)**

52. *Qui tam* plaintiffs hereby reallege and incorporate herein by this reference paragraphs 1 through 51, inclusive, hereinabove, as though fully set forth at length.

53. Through their conduct Defendants have knowingly submitted, or caused to be submitted, false claims for payment, as set forth above, in violation of 31 U.S.C. § 3729(a)(1). Additionally, Defendants have knowingly used, and caused to be used, false records or statements to get false or fraudulent claims paid by the United States, in violation of 31 U.S.C. § 3729(a)(2). Finally, Defendants

15

Complaint for Violations of False Claims Acts

have acted in a conspiracy to get false or fraudulent claims allowed or paid. As a result of such knowing wrongful conduct the Defendants have caused payments to be made from, and have wrongfully received monies derived from, the United States Treasury in the millions of dollars.

## VIII. COUNT TWO

### (For Violation of Fla. Stat. 68.081 *et seq.*)

### (Against all Defendants)

54. *Qui tam* plaintiffs hereby realleges and incorporate herein by this reference paragraphs 1 through 51, inclusive, hereinabove, as though fully set forth at length.

55. Defendants' knowing misconduct as described above is in violation of Fla. Stat. 68.081 *et seq*, and has caused damage to the State of Florida in an amount to be determined at trial.

## IX. COUNT THREE

### (For Violation of Tex. Hum. Res. Code § 36.001 *et seq.*)

### (Against all Defendants)

56. *Qui tam* plaintiffs hereby realleges and incorporate herein by this reference paragraphs 1 through 51, inclusive, hereinabove, as though fully set forth at length.

57. Defendants' knowing misconduct as described above is in violation of Tex. Hum. Res. Code § 36.001 *et seq*, and has caused damage to the State of Texas in an amount to be determined at trial.

## X. COUNT FOUR

### (For Violation of Tenn. Code Ann. § 71-5-181 *et seq.*)

### (Against Defendant Health Management Associates)

58. *Qui tam* plaintiffs hereby realleges and incorporate herein by this reference paragraphs 1 through 51, inclusive, hereinabove, as though fully set forth at length.

Complaint for Violations of False Claims Acts

59. Defendant's knowing misconduct as described above is in violation of Tenn. Code Ann. § 71-5-181 *et seq*, and has caused damage to the State of Tennessee in an amount to be determined at trial.

## XI. COUNT FIVE

### (For Violation of Va. Code Ann. § 8.01-216.3 *et seq*.)

### (Against Defendant Health Management Associates)

60. *Qui tam* plaintiffs hereby realleges and incorporate herein by this reference paragraphs 1 through 51, inclusive, hereinabove, as though fully set forth at length.

61. Defendant's knowing misconduct as described above is in violation of Va. Code Ann. § 8.01-216.3 *et seq*, and has caused damage to the State of Virginia in an amount to be determined at trial.

**WHEREFORE**, *qui tam* plaintiffs pray for relief as follows:

1. Full restitution to the United States, the States of Florida, Tennessee, Texas and Virginia of all money damages sustained by each, respectively;

2. For three times the dollar amount proven to have been wrongfully sold to, paid by or withheld from the United States, the States of Florida, Tennessee, Texas and Virginia of all money damages sustained by each, respectively;

3. For maximum civil penalties for all false records, statements, certifications and claims submitted to the United States, the States of Florida, Tennessee, Texas and Virginia of all money damages sustained by each, respectively;

Complaint for Violations of False Claims Acts

4. For costs of suit and reasonable attorney's fees; and

5. For such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: 6/26/04

Brendan V. Monahan  WSBA 22315
Velikanje, Moore & Shore, P.S.

Donald R. Warren
**WARREN ▪ BENSON LAW GROUP**

Attorneys for Qui Tam Plaintiffs

**PLAINTIFFS DEMAND A JURY TRIAL**

Dated: 6/26/06

Brendan V. Monahan  WSBA 22315
Velikanje, Moore & Shore, P.S.

Donald R. Warren
**WARREN ▪ BENSON LAW GROUP**

Attorneys for Qui Tam Plaintiffs

---

18

Complaint for Violations of False Claims Acts